UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x
YORAM FINKELSTEIN,                                    :
                                                      :
                         Plaintiff,                   :       05-CV-00392  (RJH)
                                                      :
                                                      :       Assigned to: Hon. Richard J. Holwell,
              -vs-                                    :       U.S.D.J.
                                                      :
JOSEPH MARDKHA, COLORMASTERS, INC.    :
and DIAMOND INNOVATIONS, LLC,             :
                                                      :
                         Defendants.                  :
-------------------------------------------------------------- x

## MEMORANDUM OF LAW IN SUPPORT OF MOTION PURSUANT TO FED. R. CIV. P.  56 FOR SUMMARY JUDGMENT

**DREIER LLP**
499 Park Avenue
New York, New York 10022
(212) 328-6100

*Attorneys for Defendants
Joseph Mardkha, Colormasters, Inc. and Diamond
Innovations, LLC*

Of Counsel:
     Jeffrey A. Mitchell, Esq.
     Don Abraham, Esq.

{00171571.DOC;}

TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................ 1

FACTS RELEVANT TO THIS MOTION......................................................................... 4

A.    Background ....................................................................................................... 4

B.    The Invention .................................................................................................... 5

C.    The Patents........................................................................................................ 7

D.    Plaintiffs Patent Claims.................................................................................... 10

E.    Admissions by Plaintiff..................................................................................... 11

ARGUMENT .................................................................................................................... 13

POINT I
        SUMMARY JUDGMENT DISMISSING AN INVENTORSHIP CLAIM IS
        APPROPRIATE WHEN THE PLAINTIFF CANNOT SHOW THAT HE WAS AN
        INVENTOR BY CLEAR AND CONVINCING EVIDENCE ........................................ 13

POINT II
        PLAINTIFF HAS FAILED TO ADDUCE CLEAR AND CONVINCING EVIDENCE
        THAT HE IS AN INVENTOR OF THE DIAMOND...................................................... 14

POINT IV
        PLAINTIFF'S OWNERSHIP CLAIM  MUST BE DISMISSED AS A MATTER OF
        LAW ...................................................................................................................... 18

POINT V
        PLAINTIFF'S CLAIM OF INVENTORSHIP SHOULD BE BARRED UNDER THE
        DOCTRINE OF LACHES AND ESTOPPEL................................................................ 19

POINT VI
        PLAINTIFF'S CONSTRUCTIVE TRUST CLAIM  MUST BE DISMISSED AS A
        MATTER OF LAW ................................................................................................. 23

POINT VII
        PLAINTIFF'S UNJUST ENRICHMENT CLAIM MUST BE DISMISSED AS A
        MATTER OF LAW ................................................................................................. 28

CONCLUSION................................................................................................................. 30

## PRELIMINARY STATEMENT

According to statute, the inventor named in an issued patent is entitled to a presumption of validity. Therefore, a plaintiff must do more than offer his own testimony in protest if he is to overcome that presumption and compel a change of the named inventor. To avoid summary judgment, he must come forward with corroborated proof of inventorship sufficient to show that if given the chance, he could establish by *clear and convincing* evidence at trial that he, and not the person named in the patent, is the actual inventor. At the close of discovery, it is undisputed that plaintiff cannot possibly meet that burden here. Not only are his bald assertions of inventorship unsupported by any corroborating evidence whatsoever, but indeed, they are also expressly contradicted by documents and third party testimony. The record is similarly devoid of the required proof that the parties ever discussed, let alone agreed to, any of the essential elements of a partnership or joint venture to support the claim for imposition of a constructive trust.

At issue are two patents, one a design patent for a new diamond design, and the other, a utility patent application the claims of which have now been allowed, which describes that new design in words. Defendant Joseph Mardkha ("Mardkha") is identified in both patents as the sole inventor. Plaintiff Yoram Finkelstein ("plaintiff" or "Finkelstein"), Mardkha's brother-in-law, claims without any evidentiary support that the design was really his idea.

Mardkha has been in the jewelry manufacturing business for over 25 years, and is considered an expert in precious color gemstones, such as rubies, emeralds, and sapphires. Unlike diamonds, which are generally cut to show off a stone's brilliance, the faceting arrangement for a color gem is intended to do the opposite – to draw light into the stone to show off its hue. Mardkha had long thought to cut a diamond like a color stone to accentuate its depth rather than sparkle. Most importantly, he described his idea to a Tiffany senior officer in late 1998, who testified at deposition confirming that conversation, as well as a more detailed follow-up discussion in January 1999.

Plaintiff, on the other hand, says he only first considered inventing something in July, 1999, and even then, could not describe what it was he set out to create, nor could he even produce one corroborating witness or piece of evidence.

After those discussions with the Tiffany executive, Mardkha proceeded to have his new design cut in Israel, along with other "cushion" shaped stones using known faceting arrangements to observe the result. Pleased with what he saw, from there, the unique design was refined to also make it, to Mardkha's eye, more marketable. Finkelstein never cut any stones himself, as he has never worked professionally as a diamond cutter. Rather, as he did with the other more commonly shaped diamonds ordered through him by Colormasters for which he was paid over $200,000, he had stones cut for Mardkha by others. Even the person plaintiff offered as his possible expert testified that there was nothing unique about any of the facets in the patented stone, and one need not be skilled in the art of diamond cutting to conceive of the unique combination of cuts that comprises Mardkha's invention.

The novel faceting arrangement conceived by Mardkha is really quite simple. It consists of brilliant facets in the crown (top) and step facets in the pavilion (bottom) with a cushion shaped girdle (*See* diagram annexed hereto as Exhibit "A"). For whatever reason, no one had ever thought to cut a diamond in quite that way. It was precisely because Mardkha's primary expertise was in color gemstones that he conceived of this cut in the first place. Where plaintiff misses the point is that the invention was complete the first time Mardkha had a stone cut at his direction with this unique faceting arrangement, whether or not it yet looked beautiful. That subsequent iterations of the design also made it aesthetically pleasing do not go to inventorship. Beauty and marketability are hallmarks of jewelry design, but are not elements of patentability. Plaintiff's case focuses exclusively on these subsequent iterations, and ignores completely that the concept for the original design was Mardkha's alone.

Even if the Court excuses plaintiff's lack of corroborating proof of conception, the undisputed record in any event shows that it was Mardkha who was not only the inventor, but also the

{00171571.DOC;}

person who perfected the design after the invention was complete. The patent application process, about which plaintiff admits he was aware because he provided some measurements, was accomplished by lawyers hired by and paid for solely by Mardkha. A little more than a month after the applications were filed, plaintiff conceded that he received and marked-up without objection a memorandum describing the invention and application process, which document expressly identifies Mardkha as the sole inventor. When Mardkha was looking to determine whether his invention could be manufactured in various sizes, plaintiff himself, hoping to get Mardkha to use one of his Israeli contacts so he could earn commission, got those manufacturers to sign confidentiality agreements which expressly identified Mardkha's companies as the sole and exclusive owner of all intellectual property rights in and to the invention. Indeed, every document that expressly discusses the invention identifies Mardkha and his companies as the inventor and owner of all rights in and to it.

On the other side, plaintiff has almost nothing. He says he has no relevant business records at all, despite being self-employed. He claims that he paid cutters in cash, and they did not provide receipts. He likewise kept no notes, drawings, memoranda or other similar documents from which the Court could even extrapolate that he might have been the inventor. Even his own witnesses could not say that plaintiff conceived of and created the design. On such a record, and in the face of such strong contrary documentary and testimonial evidence, plaintiff cannot possibly prevail, let alone by *clear and convincing* evidence.

With respect to the claim of constructive trust grounded on the alleged existence of a partnership arrangement with Mardkha, plaintiff's record is equally barren. He admits that there was no meeting of the minds on any of the terms New York law deems essential to the creation of a partnership, such as percentage interests of the respective parties, sharing of profits and losses, termination, and the like. Those admissions make it impossible for plaintiff to prove the existence of

the partnership relationship required to impose a constructive trust, let alone one that complies with the statute of frauds.

On the undisputed record made during discovery, defendants are entitled to a judgment dismissing the Complaint as a matter of law, and accordingly, respectfully request that the Court award them Summary Judgment.[1]

## FACTS RELEVANT TO THIS MOTION

### A.    Background

Mardkha has been in the jewelry manufacturing business for his entire adult life. He started his company Colormasters, Inc. ("Colormasters" or the "Company") 25 years ago, which has grown to employ approximately 90 people today. The Colormasters factory, now located on East 44th Street in Manhattan, includes separate areas for metallurgy, casting, stone cutting, setting, polishing, and finishing. (Mar. 6-9; See, Company history at www.colormasters.com) The Company, known worldwide for its color gemstone business, primarily serves a high-end retail store customer base, including the world renowned Tiffany and Company ("Tiffany"). (Han. 12-14, 103-104) Defendant Diamond Innovations, LLC ("Diamond Innovations") was formed for the purpose of holding and exploiting the patents that underlie this action. (Mar. 9-11)

Finkelstein is Mardkha's brother-in-law by marriage. He married Mardkha's sister-in-law in June 1998, and the two only became acquainted a short time before then. (Pl. 34-38; Mar. 20) Finkelstein identifies himself as a "diamond designer" (a title even his employer never heard of [Gil.

---

[1] References herein to deposition transcripts include those of plaintiff ("Pl."), Mardkha ("Mar."), Linda Hanson ("Han."), Haim Giladi ("Gil."), Nicki Meir ("Meir"), and Mark (Martin) Haske ("Haske"). Copies of the deposition transcripts and other documentary exhibits referenced herein are annexed to the accompanying binders captioned *Exhibits In Support of Defendants' Motion For Summary Judgment* and the *Deposition Transcripts in Support of Defendants' Motion for Summary Judgment,* all of which are incorporated by reference in the supporting Affidavit of Jeffrey A. Mitchell dated June 29, 2006 ("Mitchell Aff."). Copies of the Affidavits of Carrie-Ann Colby ("Colby Aff.") and Douglas Weintraub ("Weintraub Aff.") are annexed to the Mitchell Aff.

114]) – which he says is simply someone who takes any rough stone and turns it into a polished diamond. (Pl. 8-11)  Until plaintiff was hired by an Israeli company known as GNN Diamonds, Ltd. ("GNN") in June 2003, he was self employed.  He maintained no office, and during all times relevant to this action, principally worked from a shared table on the floor of the Israel Diamond Exchange. (Pl. 6, 42-44; Gil. 36-38) Occasionally, he also worked as a diamond broker receiving a commission, but more often, he earned a spread between the purchase price and the selling price of a stone. (Pl. 26-33, 42; Mar. 65-68)  In commissions and sales, between 1998 and 2002, Colormasters paid Finkelstein over $200,000. (Pl. 349-359; Ex. "C")  Inexplicably, Finkelstein has no business or tax records to show his volume of business either before or during the period he worked with Mardkha, but from what was produced and by plaintiff's testimony, it appears he earned, at best, between $10,000 and $20,000 a year from 1999 through 2005 for his work as a self proclaimed "designer". (Ex. "D")

Having the jewelry business in common, and looking to help his family, after the marriage, Mardkha began to direct some of Colormasters' diamond purchases through plaintiff. (Mar. 20-23, 260-261)  In fact, on purchases from known manufacturers, the Company paid plaintiff commissions as high as 3% on purchases made, even though it is standard in the industry for only a 1% commission to be paid by the *seller*, and not the purchaser. (Mar. 23, 258-261; Gil. 11-12).  This industry custom was confirmed by one of plaintiff's own witnesses, his current employer, Haim Giladi, a general partner (owners) of GNN. (Gil. 4, 11-12)  Mardkha liked and wanted to help his new brother-in-law, and all things being equal, there was no reason he could not direct some of his diamond purchases through him in Israel. (Mar. 20-23, 56-59, 258-261)

**B.**     **The Invention**

Long before he ever met plaintiff, Mardkha had toyed in his head with the idea of cutting a diamond like a color stone, in a cushion shape with a brilliant faceted crown and a step faceted

{00171571.DOC;}

pavilion. (Mar. 33-34) The retail diamond market was at the time very focused on brilliance and sparkle, and no one had apparently ever thought to combine those cuts in that way, presumably because the result would be a far more subdued stone than was considered popular. Mardkha, however, wanted to achieve a stone that would show off the depth and color*lessness* of a diamond, something that few others did. (Mar. 52-55)

Before embarking on the process, Mardkha met in late 1998 with Linda Hanson, then a Senior Vice President of Tiffany. (Mar. 36-37; Han. 14-15) He wanted to both gauge her interest in the design, as well as make sure his best customer would not object to him working on pursuing his idea. In their first conversation, Ms. Hanson, who was herself working for Tiffany on what would ultimately become the patented *Lucida* diamond, liked the idea personally, but said that her company would not be interested in it. (Han. 15-16) They spoke again in January 1999 in greater detail about the concept, in which conversation she actually encouraged Mardkha to pursue his idea because it sounded like something that might work commercially even though Tiffany had no interest in it at that time. (Mar. 37-41; Han. 14-23)

Mardkha thereafter decided to have a prototype stone cut in Israel to keep word of his invention from spreading through the New York diamond marketplace. (Mar. 59) He purchased rough and through plaintiff had cut for him a series of cushion shaped stones with various faceting arrangements, including his new one (*brilliant crown, step pavilion*) and others (brilliant crown, brilliant pavilion; step crown, step pavilion, etc.). (Mar. 78-79; Ex. "E") This was the final step in reducing his invention to practice. (Pl. 113-116, 321-325, 328-331) By starting with different permutations of a cushion shaped diamond, he was able to more specifically direct changes in the novel *brilliant crown, step pavilion* faceting arrangement to also make his invention more pleasing to the eye. Those changes, over the development phase, consisted of directions to add "more cushion" (increase the bulge in the sides), "more depth" (add an additional step or change angles), "bigger

{00171571.DOC;}

table" (the flat portion on top of the stone), more "rounded" corners, and mixes and matches of those. (Ex. "F") There ultimately came a time when Mardkha thought his directions had succeeded in achieving both novelty *and* beauty, and at that point, he hired lawyers to begin the patent process. (Pl. 102-110; Mar. 78-83, 92, 96-105)

Plaintiff's claims of invention derive not from the conception of the design, but rather, from his participation in the process of having various iterations of the stone cut by others for Mardkha in Israel after the invention was complete. However, he confuses "invention" with "marketability". Once Mardkha conceived and reduced to practice a cushion shaped stone with a brilliant crown and step pavilion, the inventive process was complete. Relaying directions from Mardkha to diamond cutters during the process of making the invention more beautiful does not transform plaintiff into an inventor himself. Moreover, plaintiff does not point to even one specific part of the invention and claim it as his own, let alone offer corroborating evidence of such a creation. For example, he does not say he resolved any insurmountable hurdle (there were none), invented some new facet cut (there are none), or worked out any particular facet angle (the invention is expressly general). (Pl. 110; Colby Aff.; Weintraub Aff.; Haske 119-121, 177) Instead, he simply tries to take credit for everything, even though his evidence consists of nothing.

## C.    **The Patents**

On December 31, 2002, the United States Patent and Trademark Office ("USPTO") issued design patent D467,833, titled "Mixed Cut Diamond", and which identified "Joseph Mardkha" as the inventor of a cushion shape diamond shown in six attached drawings (the "Design Patent"). (Ex. "G") On November 21, 2002, the USPTO published utility patent application number 2002/0170315, which also identified "Joseph Mardkha" as the inventor of the same diamond originally depicted in the Design Patent (the "Utility Patent"). (Ex. "H") The Utility Patent application contained the drawings used in the Design Patent, but added written descriptions of

different portions of the stone.  On February 22, 2006, the USPTO sent a Notice of Allowance of the

Utility Patent, authorizing its issuance (the "Allowance").  (Ex. "I")  Patents for the diamond have

since issued to Mardkha throughout the world without objection (*See* Exhibit "B" hereto)

The Design Patent contains nothing more than drawings of the design, and protects it in a

broad way.  It attributes the invention to Mardkha.  Plaintiff has no proof that he conceived of the

design, and indeed, the report he offers by his supposed expert focuses on particulars of facet angles,

and not on the overall design itself.  (Ex. "J")  Significantly, the expert report does not challenge the

Design Patent at all, and plaintiff himself concedes that the uniqueness of the diamond design is not

in the facet cuts themselves; rather, it is in the way the facet cuts are arranged.  (Ex. "J")(Pl. 110)  In

this regard, plaintiff adduced no evidence of his contribution to this unique faceting arrangement

(brilliant cut crown facets with step cut pavilion facets).

The Utility Patent (Ex. "I") clearly derives from the same diamond shown in the Design

Patent.  Of its nine drawings, six are identical to those in the Design Patent.  The last three are top

views of the same stone.  As with all Utility Patents, this one contains *independent* and *dependent*

claims (*See*, Colby Aff.).  The USPTO has allowed five separate independent, or broad claims.  They

are set out in Claims 1, 2, 45, 54 and 55 of the Allowance.  Claims 45 and 54 are illustrative of the

breadth of the patent.  Claims 45 and 54 state:

> 45. A mixed cut gemstone comprising
>     a brilliant cut crown; and
>     a step cut pavilion, said step cut pavilion having at least two steps, said first
> step being closest to the crown and having triangular shaped facets.

*    *    *

> 54. A diamond comprising:
>     a girdle cushioned in shape;
>     a crown being positioned adjacent the girdle, and
>     a step cut pavilion being positioned adjacent the girdle opposite the crown, said
> pavilion having a first step and a second step, the first step being adjacent the girdle, the
> first step having more facets than the second step, said first step having exclusively
> triangular shaped facets.

The Utility Patent application (Ex. "H") makes clear that the express intent is that the patent cover a wide range of possible permutations, and not be limited by any particulars. Paragraph [0051] of the patent states:

> While only a limited number of embodiments of the invention have been shown and described in detail, there will now be obvious to those skilled in the art many modifications and variations satisfying many or all of the objects of the invention but which do not depart from the spirit thereof as defined by the appended claims. For example, although there has been shown only a square cut stone, the invention contemplates any straight edged polygon stone. Additionally, although a stone with four pavilion steps has been described, the invention contemplates any plurality of steps combined with the unique first step facet structure herein described.

(Ex. "H")

The patent examiner similarly reported in the Examiner's Amendment made part of the Allowance that it is the unique faceting arrangement, and not the particulars of any angles, that make the stone patentable. She wrote:

> Newly allowed claims are allowable as the prior art fails to teach or make obvious the gemstone as claimed comprising a step cut pavilion with at least two steps, with the first step having exclusively triangular shaped facets. While examiner could argue that various facet shapes are known, examiner believes the applicant has made a clear and convincing argument for the benefits of the specific arrangement and facet design of the claimed gemstone, and that any piecemeal assembly of parts by examiner would be based on impermissible hindsight.

(Ex. "I")

The Utility Patent also contains *dependent* claims that derive from some of the various independent claims, but those more specific dependent claims merely describe in words what is shown in the drawing (Colby Aff.). However, the more general *independent* claims set out the breadth and scope of the invention. (Colby Aff.) As the plain language of the Utility Patent states, this invention is not grounded in its specifics, but rather, in the general arrangement of brilliant facets in the crown and step facets in the pavilion of a diamond, which can be in varying shapes and angles,

and not just the one shown in the drawings. Indeed, the invention here was patentable even before it was reduced to practice in its final form, a date which precedes plaintiff's involvement. (Colby Aff.; Pl. 101-110, 330)

In the fall of 2002, all rights in and to the diamond design were licensed to Tiffany, which has since made the stone a centerpiece of what it calls its *Legacy Collection*. (Ex. "K") Even the Tiffany Employee Manual, in its description of the stone, says that it is cut in a wide variety of sizes with varying facet angles, further evidencing that the invention is not in its details, but rather, in the general faceting arrangement conceived by Mardkha long before plaintiff got involved. (Ex. "L")

**D.      Plaintiffs Patent Claims**

In seeking amendment of the patents, plaintiff claims that only someone skilled in the art of diamond design could have conceived and created the underlying diamond. However, the following evidence is undisputed:

- The idea for the design came from Mardkha's world of color gemstones, many of which have historically been cut with brilliant crown facets and step cut pavilion facets. (Mar. 33-34, 52-55; Han. 91-96)

- Mardkha conceived of the invention long before the July, 1999 date plaintiff said he sat down to invent something new and undefined, and the uncontroverted testimony of a corroborating third party witness was that Mardkha discussed the particulars of his concept with her in late 1998 and January, 1999. (Mar. 36-37; Han. 14-23, 91-96; Pl. 146-148)

- When asked at deposition to describe his idea, the inspiration for it, and what it was he set out to create when he began his alleged inventive process, plaintiff could only say that he "wanted to invent something new", and when pressed to provide more particulars, the best he could do was "something that had not been invented before." (Pl. 93-94)

- Mardkha, on the other hand, described the inspiration for his idea as coming from the world of color gemstones, and his observation that for some reason, no one had ever thought to cut a cushion shape diamond with brilliant facets on the crown and step facets on the pavilion, similar to the way rubies, sapphires, and emeralds have historically been cut. (Mar. 33-34, 52-55; Han. 91-96)

{00171571.DOC;}

- The diamond covered by the underlying patents uses only known facet cuts (*brilliant* and *step*), and is unique only in its arrangement of those cuts with the brilliant facets on the crown and the step facets on the pavilion. (Pl. 109, 110; Haske 119-121, 177; Meir 20-21; Colby Aff.; Weintraub Aff.)

- Multiple witnesses testified that any diamond cutter skilled in the art of cutting could have cut the stone using those known facet cuts. (Pl. 98-100; Meir 20; Haske 123-126; Han. 92-93; Weintraub Aff.)

- Plaintiff's expert admitted at deposition that one need not be skilled in the art of diamond cutting to invent a cushion shaped diamond with a brilliant faceted crown and a step faceted pavilion, and that such a person would remain the inventor even if he directed someone else to physically cut the stone. (Haske 123-129, 135-136, 158-162)

- Plaintiff has never worked professionally as a diamond cutter, and he never cut any stone related to the patents. (Pl. 135-136, 138-141, 298-306)

## E.    **Admissions by Plaintiff**

Plaintiff has also admitted by conduct that he is not an inventor. First, the application for the Design Patent was filed on August 11, 2001, and for the Utility Patent on September 10, 2001. (Ex. "G" and "H") Prior to that date, plaintiff provided certain angle measurements for a drawing that was requested by the patent lawyers. (Pl. 201-204) Plaintiff concedes that he knew Mardkha had hired lawyers to file for a patent. (Pl. 205) The Utility Patent application was published on November 21, 2002, and the Design Patent was issued on December 31, 2002. (Ex. "H" and "G") Mardkha is identified as the sole inventor in all of those documents. Plaintiff admits that he never once spoke up in protest. (Pl. 280-282)

Second, and perhaps even more compelling, as Mardkha was about to embark on exploring the production phase, plaintiff was shown and commented upon a memorandum describing all of the steps taken to protect Mardkha's intellectual property rights. The memorandum expressly shows the dates of filing for the patents, and identifies "Joseph Mardkha" as the sole inventor. (Ex. "M") Plaintiff, who produced the document during discovery, identified the handwriting on the document as his own, so he plainly read it. Again, he never protested. (Pl. 80-89)

Third, before Tiffany had agreed to license the diamond, as Mardkha was exploring whether a diamond manufacturer could replicate the design in the numerous different sizes required for jewelry should he put it into production himself, he had potential manufacturers sign confidentiality agreements acknowledging that all intellectual property rights in the invention belonged to his company. Plaintiff prevailed upon Mardkha to consider two of his Israeli contacts (presumably, so he could then receive a commission) – GNN and Avi Paz Fancy, Ltd. Before doing so, Mardkha had plaintiff obtain the signature of the principals of those manufacturers on such confidentiality agreements. Plaintiff obtained those signatures, again without protest. (Pl. 62-72; Ex. "N")

Finally, plaintiff testified that by January 15, 2002 he knew that Mardkha was in the process of licensing all rights in the diamond to Tiffany. (Pl. 232-233) Yet, plaintiff never once mentioned that he was an inventor or that his invention had been stolen. In fact, plaintiff concedes that the very first time he claimed inventorship was in late November 2004 when he first filed the Complaint in this action, more than (i) three years after he knew the patents had been applied for, (ii) two years after the Design Patent issued and Tiffany licensed the right to manufacture the stone on an exclusive basis, and (iii) two years after his relationship with Mardkha dissolved. (Pl. 230-237, 280-284; Ex. "K"; Pl. 218-231). Anyone required to prove a case by *clear and convincing* evidence cannot possibly meet that burden in the face of such an evidentiary record.

As set forth more fully in Point VI below, the claim to impose a constructive trust is equally barren. Not only is there no documentary evidence of a partnership, as required, but plaintiff's own testimony concedes that *none* of the essential terms of such an arrangement was ever agreed to. Accordingly, defendants are entitled to judgment dismissing then Amended Complaint as a matter of law.

{00171571.DOC;}

## ARGUMENT

## POINT I

## SUMMARY JUDGMENT DISMISSING AN INVENTORSHIP CLAIM IS APPROPRIATE WHEN THE PLAINTIFF CANNOT SHOW THAT HE WAS AN INVENTOR BY CLEAR AND CONVINCING EVIDENCE

In a § 256 correction of inventorship proceeding, the inventor named in the issued patent is entitled to a presumption of correctness. 35 U.S.C. § 282; *Eli Lilly and Company v. Aradigm Corporation*, 376 F.3d 1352, 1358 (Fed. Cir. 2004); *Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976, 980 (Fed. Cir. 1997). The general rule is that a party alleging misjoinder or non-joinder of inventors must meet a ***heavy*** burden and prove his case by clear and convincing evidence, which must include corroborating evidence of the alleged joint inventor's conception. *Eli Lilly and Company v. Aradigm Corporation*, 376 F.3d 1352, 1358 (Fed. Cir. 2004)(*citing Ethicon, Inc. v. United States Surgical Corp.*, 135 F.3d 1456, 1461 (Fed. Cir. 1998)(holding that "an alleged co-inventor must supply evidence to corroborate his testimony of conception)). *See also, Jamesbury Corp. v. U.S.*, 518 F.2d 1384 (1975); *Congoleum Industries, Inc. v. Armstrong Cork Co.*, 339 F.Supp. 1036 (E.D.P.A. 1972)(presumption that named inventors on patent were correct may be rebutted only by showing that there was an improper misjoinder or nonjoinder of inventors by strong, clear and convincing evidence). Indeed, the lower court in *Ethicon v. U.S. Surgical*, 937 F.Supp. 1015 (D. Conn. 1996), held that a party seeking to prove conception of a patented invention may not rely solely on oral testimony of the alleged inventor because conception is a mental act. Accordingly, some form of corroborating evidence, in addition to the inventor's oral testimony, is required.

The reason such a heavy evidentiary burden is placed upon a person claiming to be an inventor has been explained by the courts as follows:

> The clear and convincing burden of proof is applied to joint inventorship disputes because of a "strong temptation for persons who consulted with the inventor and provided him with materials and advice, to reconstruct,

so as to further their own position, the extent of their contribution to the conception of the invention." [*quoting*] <u>Hess</u>, 106 F.3d at 980.

*Eli Lilly and Company v. Aradigm Corporation*, 376 F.3d 1352, 1367 (Fed. Cir. 2004).

Because plaintiff must prove inventorship by clear and convincing evidence, it is appropriate for a court to award summary judgment and dismiss a claim of inventorship if, after all reasonable inferences were drawn if favor of the plaintiff, he would not be able to show that he was the inventor by clear and convincing evidence. *See, e.g., Stern v. The Trustees of Columbia University in the City of New York*, 434 F.3d 1375 (Fed. Cir. 2006). Furthermore, when evaluating whether there exists a material factual issue in a summary judgment motion, it is well established that a fact is only material if it can affect the outcome of the action based upon the governing law. *See Kidz Cloz, Inc. v. Officially For Kids, Inc.*, 320 F.Supp.2d 164, 170 (S.D.N.Y. 2004)(*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Here, despite alleging joint inventorship in his pleading, plaintiff testified that he was the "sole" inventor. His entire claim is based on the bald allegation that he alone conceived the underlying diamond. However, the evidentiary record shows that all corroborating evidence identifies Mardkha as the inventor, making it impossible for him to prevail at all, most especially by the clear and convincing evidence standard required.

## POINT II

## PLAINTIFF HAS FAILED TO ADDUCE CLEAR AND CONVINCING EVIDENCE THAT HE IS AN INVENTOR OF THE DIAMOND

To be considered an inventor or co-inventor, an individual must demonstrate that he made a significant "inventive contribution" to the *conception* of the invention. *S. Pannu v. IOLAB Corporation*, 96 F.Supp.2d 1359 (S.D. Florida 2000). The test for "conception" is whether he had an idea that was definite and permanent enough that one skilled in the art could understand the

invention. *Murdock Webbing Company, Inc. v. Dalloz Safety, Inc.*, 213 F.Supp.2d 95, 99 (D. Rhode Island 2002). Moreover, one who merely *assists* an inventor in reducing an invention to practice is not an "inventor". Indeed, it has been repeatedly held that the "exercise of normal skill expected of one skilled in the art of a particular industry or technique utilized in the reduction of a conceived invention to practice does not make that person a joint inventor", and an inventor does not lose his status simply because he used the services of others in the process of perfecting the invention. 213 F.Supp.2d at 98.

In *Hess v. Adv. Cardiovascular Sys. Inc.*, 106 F.3d 976, 980 (Fed. Cir. 1997), the named inventors had some initial difficulty finding a suitable material for the catheter in a balloon angioplasty. After several failed attempts, the inventors consulted with an engineer named Hess, who eventually showed them how the balloon could be formed, and offered other suggestions about the catheter. Even though the inventors used his suggestions and material, the Federal Circuit held that this contribution "did not constitute the conception necessary to establish co-inventorship" *Id.* at 981. The court reasoned that the engineer's assistance to the inventors was nothing more than explaining what the then state of the art was and supplying material to the inventors. *Id.* at 980.

The cases dealing with inventorship disputes are replete with holdings that an individual may not be considered an inventor if his only contribution to the invention is explaining known concepts in the industry or the current state of the art in a particular industry. *Murdock Webbing Company, Inc. v. Dalloz Safety, Inc.*, 213 F.Supp.2d at 99; *Chirichillo v. Prasser*, 30 F.Supp.2d 1132 (E.D. Wisconsin 1998)(one who simply provides the inventor with well known principles and uses ordinary skill in the art or industry is not deemed an inventor); *Ethicon v. U.S. Surgical*, 135 F.3d 1456, 1461 (Fed. Cir. 1998)(one who simply provides the inventor with well-known principles or explains the state of the art does not qualify as a joint inventor); *Hoop v. Hoop*, 279 F.3d 1004 (Fed.

Cir. 2002)(one may not qualify as an inventor by merely assisting the actual inventor after conception of the claimed invention).

In *Sunbeam Products, Inc. v. Wing Shing Products (BVI) Ltd.*, 311 B.R. 378 (S.D.N.Y. 2004), the Court – following the precedent of the *Hoop* case cited above – held that an inventor under the patent laws is the person or persons who conceived the invention, and his legal status does not change simply because the inventor uses the services, ideas, and aid of others in the process of perfecting the invention. *Id.* at 388.

In *Mueller Brass Co. v. Reading Industries, Inc.*, 352 F.Supp. 1357 (E.D. Pa. 1972), the Court held that while the issue of inventorship could be quite difficult, it is reasonably clear that a person who merely followed instructions of another is not an inventor. *Id.* at 1372. The Court further held that even if an experimenter perfects another's concept through suggested improvements, that person still does not qualify even as a co-inventor unless the improvement is so significant as to amount to a complete invention in and of itself. *Id.* at 1373. *See also, Halliburton Co.*, 493 F.Supp. 1376 (W.D. La. 1980), *aff'd*, 667 F.2d 1232.

In *Chirichillo v. Prasser*, 30 F.Supp.2d 1132 (E.D. Wisconsin 1998), the Court held that a person who aids an inventor and contributes to an invention, even in making improvements to the invention so it is more workable or safer, does not become an inventor because it is not capable of being said that without such assistance, the inventor's concept would not have been reduced to practice. *Id.* at 1137.

At his deposition, plaintiff testified that he was the "sole inventor" of the patented diamond. (Pl. 102-103, 121, 151-152, 281, 348) Yet the evidence adduced during discovery fails to provide any corroboration of the claim of "sole" inventorship. There is no evidence that Plaintiff's work with other diamond cutters rose to a level that could ever justify a claim of a joint or sole

inventorship, most especially by the clear and convincing evidence standard required. The following facts are undisputed:

- The idea to combine brilliant facets in the crown and step facets in the pavilion of a diamond was Mardkha's. (Mar. 33-34, 52-55; Han. 91-96)

- Mardkha discussed the particulars of his concept with a corroborating third party witness in late 1998 and January, 1999. (Han. 14-23, 91-96), at least eight months before July or August 1999, the time plaintiff testified he supposedly first thought about coming up with a new unspecified idea for a diamond cut. (Pl. 146-148).

- Plaintiff has no corroborating evidence through testimony or documents that he contributed in any way to the conception of the invention: When asked to describe where he got the idea for the patented diamond, he answered "my mind" (Pl. 93); when asked what was "new" about the diamond, he said "[i]t's something that's never been done before" (Pl. 93); when asked when he first had this new idea for the diamond, he replied "when me and Mr. Mardkha decided to try and come up with something new" (Pl. 93-94).

- Plaintiff admits that he never had the idea for a new diamond before he met and spoke with Mardkha in July or August 1999 (Pl. 101-102)

- When the first cushion shaped diamond which combined brilliant facets in the crown and step facets in the pavilion was cut, it was based on directions from Mardkha. (Pl. 113-116, 321-325, 328-331; Mar. 78-82;Ex. "E")

- While Plaintiff at least admits that Mardkha's "opinions" contributed to the invention, he still considers himself the "sole inventor" simply because he was supposedly advising Mardkha about what can be achieved in a diamond given his expertise in diamonds. (Pl. 109)

- Plaintiff himself, his alleged expert, Martin Haske, and Douglas Weintraub, a diamond manufacturer whose company actually cuts the patented diamond for Tiffany, all confirm that the patented diamond uses only known facet cuts (brilliant and step), and is unique only in its arrangement of those cuts with the brilliant facets in the crown and the step facets on the pavilion. (Pl. 109-110, Haske 119-121, 177; Weintraub Aff.)

- Plaintiff, his supposed expert, and an independent non-party witness, Ms. Hanson, all testified that any diamond cutter skilled in the art of cutting could have cut the stone at the direction of another using those known facet cuts. (Pl. 98-100; Haske 123-126; Han. 91-94)

- Plaintiff admitted that the mechanical act of cutting a diamond does not make the "cutter" an inventor. (Pl. 139-141)

- By agreement between the parties, the only witnesses that plaintiff can call to testify concerning his alleged involvement in the development of the patented diamond (Haim Giladi from GNN and Nicki Meir, a diamond cutter) both testified that plaintiff may have been following Mardkha's instructions when working on the diamond, as both witnesses observed that plaintiff was in constant communication with Mardkha and knew of Mardkha's oversight. (Gil. 88-89; Meir 43-45)

- The only thing plaintiff provided the patent lawyers with was several of the many angle measurements of one stone, which plaintiff admitted could be obtained from a machine or measuring tool, and as plaintiff's employer, Haim Giladi from GNN, testified could be read by a machine owned by any diamond cutter. (Pl. 200-201; Gil. 68-70)

- Plaintiff's expert admitted at deposition that one need not be skilled in the art of diamond cutting to invent a cushion shaped diamond with a brilliant faceted crown and a step faceted pavilion, and that such a person would remain the inventor even if he directed someone else to cut the stone. (Haske 123-127, 135-136, 158-162)

Given those undisputed facts and admissions, Plaintiff can never meet the clear and convincing evidence standard required to amend the patent.  In contrast, Mardkha has adduced uncontroverted independent evidence that he not only conceived the patented diamond, but that he did so well before the Plaintiff says he first considered creating something.  On such a record, plaintiff's claim of inventorship must be dismissed.

### POINT IV

### PLAINTIFF'S OWNERSHIP CLAIM
### MUST BE DISMISSED AS A MATTER OF LAW

For the same reasons set forth above, plaintiff's third count in the amended complaint for ownership must be dismissed.  Plaintiff's only claim to ownership in the patents is based upon his claimed inventor status.  Plaintiff's inability to prove inventorship by clear and convincing evidence entirely eviscerates his claim of ownership as a matter of law.

{00171571.DOC;}

## POINT V

### PLAINTIFF'S CLAIM OF INVENTORSHIP
### SHOULD BE BARRED UNDER THE DOCTRINE OF LACHES AND ESTOPPEL

The equitable principles of laches and estoppel have been applied to bar judicial correction of inventorship. *See, e.g., MCV, Inc. v. King-Seeley Thermos Co.*, 870 F.2d 1568, 1571-72 (Fed. Cir. 1989)(concluding that equitable estoppel barred correction of inventorship, acquiesced, and waited four years to have inventorship corrected while the named inventors developed a company based on the patented technology); *Stark v. Advanced Magnetics, Inc.*, 29 F.3d at 1574 (C.A. Fed. 1994) (court concluded that omitted inventor was estopped from asserting inventorship claim in view of detrimental reliance and prejudice to the original inventorship); *Pannu v. Iolab Corporation*, 96 F.Supp.2d 1359 (S.D. Florida 2000)(laches and equitable estoppel are recognized defenses that may be asserted against a claim of joint inventorship); *cf., A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992).

In *Pannu v. Iolab Corporation,* the court set forth the following elements to bar an inventorship claim based on estoppel:

> (1) the party making the claim has, through misleading conduct, led the non-claiming party to reasonably infer that the claimant does not intend to enforce his claim -- "conduct" may include specific statements, action, inaction, or silence where there is a duty to speak;
>
> (2) the non-claiming party relies upon that "conduct"; and
>
> (3) due to his reliance, the non-claiming party will be materially prejudiced if the claiming party is allowed to proceed with his claim.

96 F.Supp.2d 1359 *(quoting A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d at 1029).

It has also been held that when applying the equitable doctrine of laches in order to bar a claim of inventorship, the period of delay is measured from when the claimant had actual notice of the claim or would have reasonably been expected to inquire about the subject matter. *Advanced Cardiovascular Systems v. SciMed Life Systems, Inc.*, 988 F.2d 1157, 1161 (Fed. Cir. 1993).

Even assuming Plaintiff had some legitimate claim to inventorship (which he does not), he was admittedly aware in May 2001 that Mardkha was filing for a patent, yet he did nothing to ensure that he would be named as an inventor. (Pl. 279-282) In July 2001, even before the patent application was filed, Plaintiff had potential manufacturers sign confidentiality agreements acknowledging that all intellectual property rights in the design belonged to Mardkha's company. (Pl. 62-72, Ex. "N") On October 15, 2001, a little more than a month after the patent application was filed, plaintiff concedes that he received and marked-up a faxed memorandum describing the patent and patent application. (Pl. 80-89, Ex. "M") That fax expressly identified Mardkha as the sole inventor. Aside from allegedly complaining to his wife in private, Plaintiff registered no protest about inventorship. The first time he did so was in the Complaint in this action, originally filed in the District of Delaware in November 2004, more than 3 years later. He testified:

> Q.  Well, in May of 2001 you're in communication with Miss Kiechel over information being used in a patent application, right?
> That's what you were told?
>
> A.  Not only May.
>
> Q.  But as early as May 2001 that's happening, right?
>
> A.  No, before, way before.
>
> Q.  Even before, as an ongoing matter, you're dealing with her in connection with a patent application, correct?
>
> A.  Among other things, I was dealing with her.
>
> Q.  It's your testimony here today, is that at the time of these communications, it was your belief in your head that you were the sole inventor of this diamond that was being patented?
>
> A.  Yes.
>
> Q.  The sole inventor, the only one?
>
> A.  I'm the only one who created it.
>
> Q.  Right. So, the lawyers whom you didn't hire and you weren't paying and with whom you never spoke, were filing and preparing -- were preparing and then filing these patent papers. You knew that was happening?
>
> A.  I knew that something was being prepared, yes.

Q.   And in this process, you do absolutely nothing to communicate with these lawyers to make sure that they know that they properly list you as an inventor.

MR. EFFRON:  Objection.

Q.   You do nothing.  You don't write to them.  You don't call them.  You don't communicate with them.  You did nothing.

A.   I did nothing.

Q.   Okay.  And you also did nothing to even try to protect these rights that are so valuable to you that you've now started a federal lawsuit in the United States and are traveling to the United States years later.  You did nothing, at the time when this was going on, to protect your rights and to make sure that they were protected?

MR. EFFRON:  Objection.

Q.   You did nothing?

A.   I did nothing.

(Pl. 279-282)

                                    * * *

Q.   And if you look at Page 2 of the document [Def. Ex. "9"] which is captioned Colormasters Gem Corp. Intellectual Property Portfolio, page that starts with that, it has the fax.  Page 3, there's a Summary of the Invention section.

Do you see that?

A.   Yes.

Q.   It's a description of the diamond in this lawsuit, right?

A.   Yes.

Q.   Did you read this document?

A.   I read it at certain point, yes.  I don't recall what written here.  I read it at certain point.  I don't recall what's written in it right now.

Q.   But you read it in or around October 2001, right?

A.   Yes.

Q.   You just don't remember today, you don't remember reading it today, in 2001; is that correct?

A.   I don't remember what's in it today.

Q.   You remember reading it?

A.   Yes.

Q.   Okay.  There are -- and you received a copy of this document in or about October 2001 by fax, is that correct?

A.  Yes.

Q.  Throughout the document there there's handwriting and underlines, if you flip through as you go back through the pages.

Do you know whose handwriting and underlining that is?   Is that you?

A.  Yes.

(Pl. 81-82)

* * *

Q.  Now, with respect to the first entry, the first section on Page 2 of the document, which is the page numbered 3 of the fax print on the top, it says, there's an entry that says "Inventor: Joseph Mardkha."

Do you see that?

A.  Yes.

Q.  Okay. Did you complain to anyone upon receiving this document that Joseph Mardkha was not the inventor of the diamond reflected in this document?

A.  Yes.

Q.  To whom did you complain?

A.  My wife.

Q.  Anyone else?

A.  No.

(Pl. 84-85)

* * *

Q.  Did you ever send a written communication to anyone, either in letter form, e-mail or memorandum, before the patent issued, in which you claimed you were the inventor of the diamond that underlies this lawsuit?

A.  No.

Q.  Is the first time that you ever claimed in writing that you were the inventor of the diamond that underlies this lawsuit the Complaint that was filed in this action?

A.  Excuse me, can you rephrase it?

Q.  Let me say it the other way.

Isn't it true that the Complaint filed in this action is the first time you ever communicated in writing to any, anyone that you were the inventor of the diamond that underlie this lawsuit?

A.  Yes.

(Pl. 88-89)

{00171571.DOC:}

* * *

Q.   My prior question was the first time that you claimed in writing that you were the inventor of the diamond was in the Complaint. You said that is correct. You also allege in the Complaint that Joseph Mardkha is not the inventor. Is that also the first time in writing that you ever made a claim that Mr. Mardkha was not the inventor of the diamond?

A.   Yes.

(Pl. 89)

In the interim, while plaintiff failed to act, all rights to the diamond were licensed to Tiffany on an exclusive basis with his knowledge, which thereafter introduced it as part of its trademarked *Legacy* collection. (Ex. "K" and "O")  In reliance on that exclusivity, Tiffany has invested to date over $20-million dollars in purchases of the patented diamond, just for the period from the last quarter of 2003 through the end of 2004, around the time plaintiff first appeared and claimed inventorship. (Ex. "P")  In the interim, patents have issued to Mardkha throughout the world. (Exhibit "B")  Under the law, plaintiff had a duty to speak up if he honestly believed he was an inventor.  His failure to do so as others invested so heavily in bringing the invention to market gives rise to an estoppel, and bars any claim based on laches.

In view of the foregoing, even if he had a legitimate claim of inventorship, plaintiff would be barred from making it on this record and should be estopped from asserting the claim made in counts one and three of the Amended Complaint.

### POINT VI

### PLAINTIFF'S CONSTRUCTIVE TRUST CLAIM MUST BE DISMISSED AS A MATTER OF LAW

Under New York law, it is well established that in order to have a constructive trust imposed, the plaintiff must prove four essential elements:

(1) a confidential or fiduciary relationship

(2) a promise;

(3) a transfer in reliance thereon; and

-23-

{00171571.DOC;}

(4) unjust enrichment caused by breach of the promise.

*Salter v. Merlis*, 252 A.D.2d 551, 675 N.Y.S.2d 644 (2d Dep't 1998); *Cooper, Bamundo, Hecht &
Longworth*, LLP, 2005 WL 225636 (2d Dep't 2005); *Sharp v. Kosmalski*, 40 N.Y.2d 119, 386
N.Y.S.2d 72 (1976); *Goraya v. Ali*, 194 A.D.2d 712, 600 N.Y.S.2d 104 (2d Dep't 1993); *Cleland v.
Thirion*, 268 A.D.2d 842, 704 N.Y.S.2d 316 (2d Dep't 2000)(summary judgment dismissing
constructive trust claim affirmed because evidence did not show that plaintiff's contributions and
services were made in reliance upon any promise by defendant).

Based on this established legal principal, defendants initially moved to dismiss the
constructive trust count in the Amended Complaint because plaintiff failed to allege a promise that
was breached by Mardkha to plaintiff. At that time, this Court, while evaluating a motion on the
pleadings only, denied that portion of defendants' motion and said:

> Defendant argues that plaintiff cannot establish a constructive trust claim
> because there was no promise. <u>Assuming</u> plaintiff's allegations to be
> correct, the Court disagrees.
>
> Inherent in every fiduciary relationship is a promise to act in the best
> interests of the venture or partnership to which the fiduciary belongs.
> This promise obviously precludes one party from using jointly developed
> property or information for personal gain.

(Ex. "Q", at page 30) (emphasis added). [2]  In its decision, the Court "assumed" - taking the
allegations in the Amended Complaint as true - that there existed a fiduciary relationship between the
Plaintiff and Mardkha, which was based upon a "partnership" or "joint venture" between the parties.
Based on the possibility of that fiduciary relationship, the Court inferred that plaintiff might be able
to prove the existence of a promise that was allegedly breached. Now that discovery has been
completed, it is undisputed that there was no such promise to support the existence of a partnership

---

[2] As part of that same motion, the Court dismissed the Fifth, Sixth, Seventh, and Eighth Count of
the Amended Complaint.

{00171571.DOC;}

or joint venture. Accordingly, there is no fiduciary relationship upon which to infer a promise that was allegedly breached by Mardkha.

Under New York law, partnerships and joint ventures are closely intertwined. The legal consequences of a joint venture and a partnership are equivalent, except a joint venture is essentially a partnership for a limited purpose. *Kidz Cloz, Inc. v. Officially For Kids, Inc.*, 320 F.Supp.2d 164, 171 (S.D.N.Y. 2004)(citations omitted). An essential and indispensable element of a partnership or joint venture is that the parties agree to share profits and losses. In *Kidz Cloz, Inc.*, the Court held:

> The requirement that that the parties have agreed to share in the profits and losses is an "indispensable essential of a contract of partnership or joint venture." If there was no agreement as to the manner in which the parties were to share in the profits and the losses, the agreement did not create a joint venture or partnership. . . Additionally, "the value of services [contributed by one party to the alleged partnership] is not sufficient to satisfy the required sharing of losses element." (citations and quotes omitted) (emphasis added)

*Kidz Cloz, Inc. v. Officially For Kids, Inc.*, 320 F.Supp.2d 164, 171-172 (S.D.N.Y. 2004); *See also, Kosower v. Gutowitz*, 2001 WL 1488440 (S.D.N.Y. 2001)(it is axiomatic that the all essential terms of a partnership must include an agreement to share losses as well as profits, and risk of losing value of services contributed to the partnership does not obviate the requirement that partners must agree to share losses).

Here, Plaintiff kept saying at his deposition that he was Mardkha's "partner", yet admitted there was no agreement on the essential terms of any such arrangement:

> Q.   Okay. You keep saying he's your partner. I would like to understand.
>
> Please explain to me, what was the nature of this partnership? What were the terms of the partnership? What was the agreement and when was it made?
>
> A.   Ask and I'll answer.
>
> Q.   When did you make a partnership agreement?
>
> A.   I think it was the end of, I think it was the end of '98.
>
> Q.   End of '98. Where did you make it?

-25-

A.    In Israel.

Q.    In -- where in Israel?

A.    I don't recall exactly.

Q.    Tell me all the terms of the partnership agreement you made.

A.    I -- can you be more specific.

Q.    No.  I want to know what the terms of your partnership agreement were.

A.    That we're going to manufacture together diamond, and Mardkha is going to manufacture jewelry with it and market it.

Q.    Anything else?

A.    Specifically?  No.

(Pl. 128-129)

* * *

Q.    How long did you agree with Mr. Mardkha that this partnership would last?

A.    Until the end.

Q.    What does that mean?

A.    Exactly what it sounds.

Q.    [. . .] [W]as there an end date, or was there no end date?

A.    There was no end date.

Q.    [ . . . ] What did Mr. Mardkha promise to do in connection with this partnership arrangement?

A.    That it's going to be based on percentages between me and him.

Q.    What were those percentages?

A.    Never discussed.

Q.    So you never agreed on a percentage?

A.    Never.

Q.    What was it that was supposed to be divided by the percentages that you never agreed on?

Did you discuss that?

A.    Whatever comes out from this project.

Q.    So, if Mr. Mardkha's company, Colormasters, manufactured jewelry which included casted metals, you would share in the percentage of that?

Was that your -- did you discuss that?

A.    No.

-26-

Q.  You did not discuss that?

A.  No.

Q.  Okay.  Any other terms?

There was no length of time specified, correct?

A.  Correct.

Q.  And there were no percentages ever agreed to, correct?

A.  Correct.

(Pl. 131-132)

\* \* \*

Q.  The anticipation was, when you were entering into this agreement, that Mr. Mardkha was going to be putting the money in, correct?

A.  Yes.

Q.  Did you agree with whether that money being put in would come in as a loan or as a capital contribution?  Did you reach an agreement on that?

A.  It was not discussed.

Q.  It was not discussed.

Did you agree whether or not you would have to make a capital contribution to this partnership?

A.  Capital meaning money?

Q.  Money.  Yes.

A.  I was not supposed to.

Q.  So, there was an agreement that you did not have to put money in?

A.  That was -- yes.

Q.  So you're saying that was agreed to, that you have to put no money in?

A.  That was agreed.

Q.  Did you agree on a mechanism to keep track of the money?

A.  Was not discussed.

Q.  Did you agree on how much compensation you would be paid?

A.  I'm a partner.  I wasn't expected to get paid compensation.

Q.  Did you make an agreement with Mr. Mardkha on what your stake in the partnership would be?

A.  That was not discussed.

(Pl. 410-411)

-27-

{00171571.DOC.}

Based upon the foregoing testimony, there can be no dispute that the parties never agreed on the essential terms of a partnership or joint venture, and under New York law, a Court cannot supply such essential terms by implication. *Azoulay v. Cassin*, 128 A.D.2d 660, 512 N.Y.S.2d 900 (2d Dep't 1987)(court cannot supply essential terms of an oral agreement or partnership by implication). Furthermore, a mere agreement to agree, in which a material term is left for future negotiation is unenforceable. *F & K Supply Inc. v. Willowbrook Development Company*, 288 A.D.2d 713, 732 N.Y.S.2d 734 (3d Dep't 2001).

Furthermore, since plaintiff testified there was "no end date" for this oral partnership agreement (Pl. 131), it is void and unenforceable because it cannot be performed of performance within one year. N.Y. Gen. Oblig. Law § 5-701(a)(1). Under G.O.L § 5-701(a)(1), a contract with an indefinite duration with no express provision for termination is not capable of performance within one year, and is therefore void unless in writing. *See, United Beer Distributing Co., Inc. v. Hiram Walker (N.Y.) Incorporated*, 163 A.D.2d 79, 557 N.Y.S.2d 336 (1st Dep't 1990); *United Maganzine Company v. Murdoch Magazines Distributorship*, 146 F. Supp.2d 385 (S.D.N.Y. 2001).

Accordingly, the claim to impose a constructive trust should be dismissed.

## POINT VII

## PLAINTIFF'S UNJUST ENRICHMENT CLAIM MUST BE DISMISSED AS A MATTER OF LAW

Plaintiff's fourth count seeks relief for unjust enrichment. Under New York law, the following elements must be proven in a claim for unjust enrichment:

(1) that a benefit was conferred upon the defendant;

(2) that defendant received the benefit without adequately compensating the plaintiff; and

{00171571.DOC;}

(3) that circumstances are such that equity requires that the defendant make restitution.

*Sobek v. Auattrochi*, 2004 WL 2809989 (S.D.N.Y. 2004); *National Westminster Bank plc v. Grant Prideco, Inc.*, 261 F.Supp.2d 265, 275 (S.D.N.Y. 2003).

Here, plaintiff alleged and testified that he calls himself a "diamond designer", which he says is simply someone who takes a rough stone and turns it into a polished diamond. (Pl. 8-11) His own employer never heard of anyone in the industry described as a "diamond designer" (Gil. 114), and plaintiff, in any event, never cuts stones himself (Pl. 135-136, 138-141, 298-306). Nonetheless, plaintiff says that he performed "design" work (whatever that means) for Mardkha in connection with the diamond at issue, as well as for other commonly shaped stones. (Pl. 41-46) In order to obtain evidence and possibly value the alleged benefits plaintiff says he conferred upon defendants, he was asked to produce records of payments he received throughout the course of his career as a "designer" from parties other than the defendants. Plaintiff said he has no such records, but prepared a summary in which he estimated the payments he received from others during the period 1999 to 2005 for his "diamond designing and cutting". (Ex. "D") That document shows between $10,000 to $20,000, at most, each year through 2005 for as many as 50 diamonds in any one given year (between $200 and $400 for each stone).

Mardkha testified that plaintiff's "compensation" was in the form of profits and commissions on stones purchased by Colormasters (including the "invention" stones) through plaintiff. (Mar. 20-23, 56-57, 258-261, Pl. 381) Mardkha paid "commissions" on top of the middle profit plaintiff retained, even though it is standard in the industry for such commissions to be paid to a "broker" by the seller of a diamond. (Mar. 258-261). This standard in the industry was confirmed by a plaintiff's own witness and current employer from Israel. (Gil. 11-12)

At his deposition plaintiff did not contest that he received over $200,000 from Colormasters from 1999 through 2002. (Pl. 349-359) While plaintiff says he has no records to

calculate the amount he received, Colormasters did produce business and accounting records showing precisely what was paid to plaintiff. A summary of those payments prepared by the accountants for Colormasters, and the back-up for the summary, were produced during discovery, a total of which is $210,995.11 (Ex. "C"), which includes the diamond at issue in this case.

While it is not known what profit plaintiff made on the diamonds purchased by Colormasters, he was clearly compensated for whatever services he provided. Accordingly, the fourth claim for unjust enrichment must be dismissed as a matter of law.

## CONCLUSION

For the foregoing reasons, plaintiff's Motion for Summary Judgment should in all respects be granted.

Dated: New York, New York
      June 29, 2006

                              Respectfully submitted,

                              **DREIER LLP**

                              By: _____
                                  Jeffrey A. Mitchell, Esq. (JM5323)
                                  Don Abraham, Esq. (DA4145)
                              *Attorneys for defendants*
                              *Joseph Mardkha ColorMasters, Inc., and*
                              *Diamond Innovations, LLC*
                              499 Park Avenue
                              New York, New York 10022
                              (212) 328-6100

TO:    **PELOSI WOLF EFFRON & SPATES LLP**
          Alan Effron, Esq.
          *Attorneys for plaintiff*
          *Yoram Finkelstein*
          233 Broadway – 22nd Floor
          New York, New York 10279
          (212) 334-1082

{00171571.DOC;}

Exhibit A



Table

Star facet

Bezel facet

Upper girdle facet

Lower girdle facet

Pavilion main facet

Culet

Exhibit B

## COLOR MASTERS PATENT LIST

| Docket Number | Country | Application No. | Application Date | Patent No. | Grant Date |
|---|---|---|---|---|---|
| JOMA.DP2 | US | 29/146,514 | 8/11/2001 | D467,833 | 12/31/2002 |
| JOMA.DP2.ATRA | Austria | MU516/2002 | 2/7/2002 | 49035 | 5/20/2002 |
| JOMA.DP2.BENE | Benelux | 79159-00 | 2/7/2002 | 34552-00 | 2/7/2002 |
| JOMA.DP2.CAN | Canada | 98613 | 2/8/2002 | 98613 | 5/20/2003 |
| JOMA.DP2.FR | France | 20986 | 2/7/2002 | 667749 | 6/21/2002 |
| JOMA.DP2.GERM | Germany | 401 01 133.3 | 2/7/2002 | 401 01 133.3 | 6/13/2002 |
| JOMA.DP2.ISRAEL | Israel | 36140 | 2/7/2002 | | |
| JOMA.DP2.ITALY | Italy | TO20020000034 | 2/11/2002 | 85122 | 9/14/2004 |
| JOMA.DP2.JAP | Japan | 2002-3183 | 2/18/2002 | 1165566 | 12/20/2002 |
| JOMA.DP2.SWISS | Switzerland | 128625 | 2/8/2002 | 128625 | 3/27/2002 |
| JOMA.DP2.THAI | Thailand | 71696 | 2/11/2002 | 17988 | 12/23/2004 |
| JOMA.DP2.U.K. | Great Britain | 3001386 | 2/7/2002 | 3991386 | 5/9/2002 |
| JOMA.P1 | US | 09/949,684 | 9/10/2001 | | |
| JOMA.P1.INDIA | India | 1474/KOLNP/2003 | 1/18/2002 | | |
| JOMA.P1.ISRAEL | Israel | 158946 | 11/18/2003 | | |
| JOMA.P1CAN | Canada | 2,463,642 | 1/18/2002 | | |
| JOMA.P1EPC | EPC | 2705852.8 | 1/18/2002 | | |
| JOMA.P1JAP | Japan | 2002-590778 | 1/18/2002 | | |
| JOMA.P1PCT | PCT | PCT/US02/01495 | 1/18/2002 | | |