UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                                    :
YORAM FINKELSTEIN,                                  :           05 Civ. 392 (RJH)
                                                    :
                              Plaintiff,            :
                                                    :           **MEMORANDUM**
              - against -                           :           **OPINION AND ORDER**
                                                    :
JOSEPH MARDKHA, et al.,                             :
                                                    :
                              Defendants.           :
                                                    :
-------------------------------------------------------------x

      Plaintiff Yoram Finkelstein ("plaintiff") brings suit against defendants Joseph
Mardkha ("Mardkha") and his two companies to be named co-inventor of, and acquire an
ownership interest in, patents held by Mardkha.  Plaintiff also seeks a constructive trust
over money received by Mardkha in connection with his ownership of the patent, and
alleges unjust enrichment.  Mardkha now moves for summary judgment pursuant to Rule
56 of the Federal Rules of Civil Procedure dismissing plaintiff's complaint in its entirety.
For the reasons that follow, Mardkha's motion is granted in part and denied in part.

## BACKGROUND

      This case revolves around two patents issued in defendant Joseph Mardkha's name
by the US Patent and Trademark Office.  The patents—design patent no. D467,833 issued
on December 31, 2001, and utility patent no. 7,146,827 issued on December 12, 2006—
illustrate and describe a novel shape for a diamond.  (Defs.' Ex. G); U.S Patent No.
7,146,827 (filed Sep. 10, 2001) ("'827 Patent").  Mardkha has worked in the jewelry
manufacturing business, primarily with colored gemstones, for his entire adult life, and is

the owner of defendant Diamond Innovations LLC, which owns the patents at issue, and president and majority shareholder of defendant ColorMasters, Inc.  (Mardkha Tr. 3–11.) He has no formal training in the diamond field.  (*Id.* 13–15.)  Plaintiff has worked in the diamond business for over twenty years, and currently works for GNN Diamond LLP, an Israeli company, purchasing rough diamonds and taking them through completion of finished stones.  (Pl. Tr. 11.)  Plaintiff and Mardkha met shortly before plaintiff married Mardkha's sister-in-law in June 1998.  (Mardkha Tr. 20)  At the suggestion of Mardkha's wife, the two parties began doing business together, with Mardkha ordering diamonds through plaintiff in Israel.  (*Id.* 21, 56.)  Plaintiff would act either as a broker between Mardkha and a third-party, in which case he received a commission from Mardkha, or as a seller.  (*Id.* 23–24.)

In late 1998 and again in January 1999, Mardkha spoke with a representative from Tiffany & Co. ("Tiffany") to gauge her interest for an idea he had to cut a diamond like a colored gemstone.  (*Id.* 36–39.)  While diamonds are typically cut to maximize their brilliance and sparkle, gemstones such as rubies and emeralds are cut to emphasize their depth and clarity.  Mardkha claims he conceived of this idea in 1995 or 1996, and it became more specific in his mind after he had purchased two small diamonds from a dealer in San Francisco that were cut in a similar way to the stone he envisioned.  (*Id.* 35.) In the second conversation with the Tiffany representative, Mardkha contends that he outlined his idea: a cushion shaped diamond with a brilliant crown and step pavilion.  (*Id.* 38; Hanson Tr. 17.)  To briefly explain these terms, a cushion shape is a stone whose cross-section is square with flared sides; a crown is the portion of the diamond above the widest point, called the girdle; a pavilion is the portion of the diamond below the girdle;

brilliant facets, or surfaces, are cut so as to maximize brilliance; and step facets are rectangular shaped and can be used to emphasize the depth of the stone. See attached Diagram A. The representative encouraged Mardkha, but stated at the time that Tiffany would not be interested. (*Id.* 41.)

In June 1999, Mardkha visited plaintiff in Israel to discuss his idea of a diamond cut with a brilliant crown and step pavilion. (Mardkha Tr. 52.) According to Mardkha, he told plaintiff that he was to cut samples according to his instructions, that he would pay and approve everything, and that plaintiff was to keep the project secret. (*Id.* 54–55.) Indeed, Mardkha suggests that a principal reason for taking the project to Israel and to a member of the family was that it could be kept secret from the New York market in which Mardkha worked. (*Id.* 59–60.) The first set of instructions was to cut a first batch of diamonds with different combinations of facet cuts, including brilliant/brilliant, step/step, and brilliant/step. (*Id.* 80.) There are no formal records of this meeting.

Plaintiff has a different recollection of the origin of the project, contending that in July or August of 1999, he and Mardkha had a conversation in which they agreed to enter a partnership to "come up with a new diamond design." (Pl. Tr. 94–95; 148.) The only terms of the alleged oral partnership agreement were that Mardkha would supply the capital, while plaintiff would work on the idea, and that there would be some as yet undefined division of profits between them. (*Id.* 129–135.) Plaintiff is vague on the details of the alleged conception of the design, stating that the inspiration was "my mind" and that his goal was only to "come up with something new." (*Id.* 92.) While in deposition, plaintiff insisted that the basic idea of cutting a diamond like a colored

gemstone was his and his alone, this assertion is not maintained in his opposition papers. (*Id.* 102, 348; Pl.'s Opp'n 2.)

Shortly after the meeting, plaintiff began to work alongside diamond cutters in creating a first batch of design samples and sent the samples to Mardkha.  Upon receiving the design samples, Mardkha contends that he would instruct plaintiff, either in writing or by telephone, to change angles, the size of the table, the girdle, the steps, and the number of facets, either quantitatively if numbers were available, or qualitatively.  (*Id.* 101–05.) Plaintiff would convey the instructions to the physical cutter, who would make the changes, and he would send the next set of design samples to Mardkha.  Mardkha has presented the Court with documents both showing comments made by Mardkha on the diamond design in progress and requests from plaintiff that Mardkha approve changes. (Defs.' Ex. F.)  After some dozen or two dozen design samples were sent to Mardkha in several batches, he chose a prototype and plaintiff began manufacturing hundreds of production samples.  (*Id.* 93–100.)

While plaintiff acknowledges that Mardkha, as partner, would make comments on the samples plaintiff sent to him, plaintiff classifies them as merely an expression of "opinion" and states that Mardkha never gave him "instructions."  (Pl. Tr. 103–04, 107–08, 135.)  He states that he spent hundreds of hours working alongside a diamond cutter developing and refining the particulars of the diamond, including facet shapes, alignments and angles, until it looked right.  (Pl. Decl. ¶¶ 2–3; *see also* Giladi Tr. 87; Meir Tr. 17.) Stones were sent to Mardkha only a few times during the development stage and only after they had been heavily worked and reworked.  To support this version of events, plaintiff presents contemporaneous notes and drawings showing the evolution of the stone, that at

the very least suggest a more active involvement than simply conveying instructions from Mardkha to the physical diamond cutter.  (*See* Pl.'s Exs. S, T.)  By May 2001, a stone was created that displayed the sought-after characteristics and Mardkha began the process of patenting and marketing the stone.  (Mardkha Tr. 196.)  Mardkha filed an application for a design patent on August 11, 2001 and an application for a utility patent on September 10, 2001.  (Defs.' Exs. H, M.)  During this process, plaintiff provided certain information for the utility patent application to one of Mardkha's employees, including measurements of specific angles, depths, and alignments.  (Pl.'s Ex. U.)

During the patenting process, there was an e-mail exchange where an employee at ColorMasters asked plaintiff to itemize his costs.  (Pl.'s Ex. V.)  An invoice was eventually created for plaintiff's work in the amount of $10,680.30 and that sum was deposited into plaintiff's account.  (Defs.' Ex. C; Pl.'s Ex. X.)  The invoice includes material costs, labor costs, and shipping costs that plaintiff itemized and sent to ColorMasters, and $5,000 for research, representing 100 hours at $50/hour.  (*Id.*)  Mardkha contends that he chose the $5000 "research costs" after plaintiff declined to name a price for the hours he worked on the diamond.  (Mardkha Tr. 119–21.)  Plaintiff suggests that he never received the invoice and that he assumed, when the deposit exceeded the amount he had billed ColorMasters, that the excess it was for money owed to him for unrelated work.  (Pl. Decl. ¶ 13; Pl. Tr. 269, 277.)

While plaintiff insists that he continued to trust Mardkha to protect his rights in the diamond at least until the end of 2002, Mardkha presents several documents seen by plaintiff prior to the issuance of the patent around that time that explicitly named Mardkha as the sole inventor.  (*See* Pl. Tr. 72.)  First, plaintiff obtained for Mardkha in May and July

2001 confidentiality agreements that "acknowledge[d] that Color Masters owns all right, title and interest in the Proprietary Information," although they say nothing about an inventor or invention.  (Defs.' Ex. N.)  Plaintiff claims that he merely had the forms signed and never read them.  (Pl. Tr. 65, 71.)  Second, plaintiff received in October 2001 and at some point marked up an "Intellectual Property Portfolio" from ColorMasters that listed Mardkha as the sole inventor of the diamond design and did not protest to anyone except his wife.  (Defs.' Ex. M; Pl. Tr. 84.)

In January 2002, Mardkha again contacted Tiffany and showed them some production samples.  (Mardkha Tr. 270.)  This time, Tiffany expressed interest and the parties began six to eight months of negotiation that culminated in Tiffany acquiring an exclusive license to the diamond design and making it the centerpiece of its *Legacy* collection.  (*Id.* 275, 277.)  Mardkha's companies have received $1.25 million through the first quarter of 2006 pursuant to this license.  (*Id.* 286.)

In March 2002, plaintiff came to the United States to attend the bar mitzvah of Mardkha's son.  At this time, he asked Mardkha whether Tiffany would purchase diamonds through him and if not, where he stood in regards to the diamond.  Mardkha told plaintiff that it was up to Tiffany where they wished to purchase their diamonds and that he could not answer that.  If they chose not to purchase through his company, such that he could source the diamonds through plaintiff, then, Mardkha told plaintiff, "You don't stand anywhere."  (*Id.* 240.)  While the two parties continued to work together for the remainder of the year, Mardkha sensed that plaintiff was "tense" in relation to the stone.  (*Id.* 250–51.)  At the end of the year, Mardkha offered plaintiff $100,000 in relation to the diamond design, but insists that he only expected a "thank you" in return, and was not expecting

plaintiff to waive any claim he had in connection with the stone because, according to

Mardkha, "He had no claim." (*Id.* 248–49.) Plaintiff did not provide Mardkha with a

timely response, and formally refused the offer several weeks later in an e-mail. (Pl. Tr.

447.) Communications broke off entirely between the two parties.

On December 31, 2002, the USPTO issued a design patent consisting of five

drawings of the prototype diamond with Mardkha listed as the sole inventor. (Defs.' Ex.

G.) At that time, plaintiff knew that Tiffany was going to license the diamond from

Mardkha alone, although it is unclear he saw the issued design patent. (Pl. Tr. 233–34.)

Plaintiff and his wife began to tell his wife's family that they believed Mardkha had

improperly excluded him from the benefits of the diamond design. (Mardkha Tr. 265–67.)

In November 2004, slightly less than two years later, plaintiff filed this action in the United

States District Court in the District of Delaware, claiming, inter alia, that he was the sole or

co-inventor of the design and alleging breach of contract based on non-payment of

commissions by ColorMasters. This complaint was the first time plaintiff put in writing

his contention that he was the sole or joint inventor of the diamond at issue. (Pl. Tr. 88–

89, 284.) On February 22, 2006, after this suit had been transferred to this Court, the

USPTO authorized the issuance of a utility patent containing the same drawings as the

design patent and also describing the invention in words, again listing only Mardkha as the

inventor. (Defs.' Ex. I.) That utility patent issued in December 2006. '827 Patent. The

scope of these patents is described in greater detail below.

### STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine issue as to any material

fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.

56.  The moving party must demonstrate that no genuine issue exists as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986).  It can satisfy this burden by showing that the opposing party is unable to establish an element essential to that party's case and on which that party would bear the burden of proof at trial.  *See id.* at 321; *Gallo v. Prudential Servs.*, 22 F.3d 1219, 1223-24 (2d Cir. 1994).  In reviewing the record, the district court must assess the evidence in "the light most favorable to the non-moving party," resolve all ambiguities, and "draw all reasonable inferences" in its favor.  *Am. Cas. Co. v. Nordic Leasing, Inc.*, 42 F.3d 725, 728 (2d Cir. 1994).  The "non-movant may defeat summary judgment only by producing specific facts showing that there is a genuine issue of material fact for trial."  *Samuels v. Mockry*, 77 F.3d 34, 36 (2d Cir. 1996).  "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).  In the context of the pending motion, summary judgment is proper if the evidence, when viewed in the light most favorable to the non-moving party, fails to establish the inventorship of an omitted inventor by clear and convincing evidence.  *See Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1327 (Fed. Cir. 2004) (citing *Teleflex Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1323 (Fed. Cir. 2002)).

## DISCUSSION

Mardkha contends that the subject matter of the patent is quite simple, and consists only of a cushion-shaped diamond with a brilliant crown and step pavilion.  The invention was conceived by him alone, and conception was complete by the time he involved plaintiff in the process.  (Defs.' Mem. of L. 6, 10.)  Plaintiff's entire contribution consisted of "relaying directions from Mardkha to diamond cutters" and clearly does not rise to the

level of co-inventorship.  (*Id.* 7.)  Moreover, plaintiff is barred by laches or otherwise estopped from asserting co-inventorship because he assisted or remained silent as Mardkha proceeded through the patenting process.  (*Id.* 19–23.)

While plaintiff claimed in his deposition that he in fact conceived of a mixed cut diamond with a brilliant crown and step cut pavilion (Pl. Tr. 93, 102), he now contends that this design is neither novel nor unique.  (*See* Pl.'s Opp'n 6.)  Rather, plaintiff contends that he conceived of all the particulars of the diamonds—the detailed facet arrangements, shapes, and angles that make the design patentable.  (*Id.* 13.)  According to plaintiff, those particulars, contained within the fifty-five claims of the utility patent and a lengthy introductory section, are the essence of the diamond and the patent and make him the sole inventor, or at least a co-inventor.  (*Id.*)  He offers as corroborating evidence of his contribution to these particulars his superior knowledge of diamonds, testimony of the diamond cutter and factory owner, and notes taken during his work on the stone.  (*Id.* 14–26.)  Finally, plaintiff contends that laches and estoppel do not apply because he did not unduly delay bringing this action, and there was no prejudice to Mardkha from his delay.  (*Id.* 26–29.)

## I.      Co-inventorship and Co-ownership

Under 35 U.S.C. § 256, an inventor who was erroneously omitted from a patent may seek correction of the patent in federal court.  In a § 256 proceeding, "the inventors as named in an issued patent are presumed to be correct."  *Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976, 980 (Fed. Cir. 1997) (citations and internal quotation marks omitted).  Because of this presumption and the temptation for even honest witnesses to reconstruct events in a favorable manner, the claimed inventor must meet a heavy burden

of proving his case by clear and convincing evidence.  *See id.*  To satisfy this standard, the claimed inventor must provide evidence corroborating his testimony concerning conception of the invention.  *See Ethicon, Inc. v. United States Surgical Corp.*, 135 F.3d 1456, 1461 (Fed. Cir. 1998); *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1358 (Fed. Cir. 2004).  Corroborating evidence may take many forms, including contemporaneous documentary or physical evidence, oral testimony of others, and circumstantial evidence.  *See Trovan, Ltd. v. Sokymat SA*, 299 F.3d 1292, 1303 (Fed. Cir. 2002); *Sandt Tech., Inc. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1350-51 (Fed. Cir. 2001).  Whether the testimony is sufficiently corroborated is evaluated under a "rule of reason" analysis, whereby the Court views all evidence before it in making a sound determination as to the credibility of the claimed inventor's story.  *Id.* at 1195.

"To be a joint inventor, an individual must make a contribution to the conception of the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention."  *Fina Oil and Chem. Co. v. Ewen*, 123 F.3d 1466, 1473 (Fed. Cir. 1997); *see also Eli Lilly & Co.*, 376 F.3d at 1358; *Ethicon Inc.*, 135 F.3d at 1460.  Conception is a term of art in patent law.  "Conception exists when a definite and permanent idea of an operative invention, including every feature of the subject matter sought to be patented, is known."  *Sewell v. Walters*, 21 F.3d 411, 415 (Fed. Cir. 1994).  Conception is complete when "only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation."  *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1228 (Fed. Cir. 1994).

A claimed inventor need not make the same type or amount of contribution as the named inventor, nor "make a contribution to every claim of a patent.  A contribution to one

claim is enough." *Ethicon, Inc.*, 135 F.3d at 1460 (citations omitted).  That is, "inventorship is determined on a claim-by-claim basis." *Trovan, Ltd.*, 299 F.3d at 1302. Moreover, "a joint inventor as to even one claim enjoys a presumption of ownership in the entire patent." *Ethicon, Inc.*, 135 F.3d at 1466.  As courts have recognized, "[t]he line between actual contributions to conception and the remaining, more prosaic contribution to the inventive process that do not render the contributor a co-inventor is sometimes difficult to draw." *Eli Lilly & Co.*, 376 F.3d at 1358.

It does not make a contributor a co-inventor when the contributor does "nothing more than explain[] to the inventors what the then state of the art was and supply[] a product to them for use in their invention."  *Hess*, 106 F.3d at 981; *see also Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*, 758 F.2d 613, 624 (Fed. Cir. 1985) ("an inventor may use the services, ideas, and aid of others in the process of perfecting his invention without losing his right to a patent").  Thus, in *Hess*, a company representative who suggested a material to two inventors and a method of binding that material was not a co-inventor where the two inventors took the material and, after significant experimentation, used the material, but not the binding method.  106 F.3d at 980–81.  Nor does exercising ordinary skill in the art to reduce an idea to practice make one a co-inventor.  *Sewell*, 21 F.3d at 416.  Thus, in *Sewell*, a computer chip designer following explicit specifications by the inventor was not deemed to be a co-inventor.  *Id.*  Nor does "merely assisting the actual inventor after conception of the claimed invention" make one a co-inventor.  *Ethicon, Inc.*, 135 F.3d at 1460.

### A.      Patent Construction

Assessing the evidence in the light most favorable to plaintiff, the Court must determine whether, as a matter of law, plaintiff will be unable to establish by clear and convincing evidence that he made a significant contribution to the conception of the claimed invention.  The first step is to construct the scope of the claims.  Only by doing so is it possible to compare the contributions of the claimed co-inventor with the subject matter of the properly construed claim to determine whether the correct inventors were named.  *See Eli Lilly & Co.*, 376 F.3d at 1360; *Trovan, Ltd.*, 299 F.3d at 1302.  Neither party has requested a formal claim construction hearing, and such a hearing is required only "when the meaning or scope of technical terms and words of art is unclear and in dispute."  *United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).

The Court must construe each patent separately in conducting this analysis, and will begin with the design patent.  "A design patent protects the non-functional aspects of an ornamental design as seen as a whole and as shown in the patent."  *KeyStone Retaining Wall  Sys., Inc. v. Westrock, Inc.*, 997 F.2d 1444, 1450 (Fed. Cir. 1993).  "An ordinary observer test governs design patent infringement: '[I]f in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other.'" *Amini Innovation Corp. v. Anthony California, Inc.*, 439 F.3d 1365, 1371 (Fed. Cir. 2006) (citing *Gorham Co. v. White*, 81 U.S. 511, 528, 20 L. Ed. 731 (1871)).  A design patent usually consists of only drawings, with no description.  *See* 37 C.F.R. § 1.153(a).  This is the case

here: the claim reads only, "I claim the ornamental design for a mixed cut diamond, as shown and described." (Defs.' Ex. G.) There follows five different perspectives of the diamond.

Mardkha argues that the design patent protects the design "in a broad way" and is properly constructed as a cushion-shaped diamond with "brilliant cut crown facets and step cut pavilion facets." (Defs.' Mem. of L. 8.) No particular facets or angles limit the design patent protection, Mardkha argues, because anything that is substantially similar to an ordinary observer would be protected. The court cannot agree with this construction. The drawings in the design patent clearly show a cushion-shaped diamond with brilliant cut crown facets. However, the pavilion does not merely consist of step cut facets. Instead, in the language of plaintiff's expert, the diamond has "brilliant tiering" immediately below the girdle, consisting of exclusively triangular shaped facets, and at least one step pavilion below. (Haske Tr. 120.) See attached Diagram B.

While the Court does not believe that an ordinary observer could tell if certain angles or facet shapes were altered slightly, the brilliant tiering section below the girdle is key to the visual effect of the diamond and is essential to the ornamental design as seen as a whole. Testimony suggests that the "simple" construction of the patent, that of a brilliant crown and step pavilion, would not display the sought after visual quality. Thus, the diamond cutter who actually cut the sample stones testified that the novel "combination" that successfully combined the elements was "the skirts on the step cut, on the first step cut," referring to the triangular faceted first step. (Meir Tr. 21; *see also id.* 19 ("invention" included "skirts on the lower step on the pavilion".) Moreover, while Mardkha points to a Tiffany employment training manual to show that the specific angles of the diamond are

not properly part of the patent construction, the manual also pictures a diamond that clearly includes a brilliant tier immediately beneath the girdle.  (Ex. L.)  Therefore, the Court construes the claims of the design patent as follows: The design drawings show a diamond with a cushion-shape with a brilliant cut crown, a brilliant tier immediately below the girdle, and three levels of step cut pavilion facets below.  The Court does not find this construction to be overly narrow, even for a design patent.  *See, e.g.*, *National Diamond Syndicate, Inc. v. Flanders Diamond USA, Inc.*, 264 F. Supp. 2d 631, 640 (N.D. Ill. 2003) (construing design patent of diamond design as consisting of the cross-sectional shape of diamond, the exact number of facets on crown and pavilion, and the shape of facet edges).

The utility patent consists of significant language in addition to drawings, including an abstract, background, brief summary, detailed description, as well as the claims.  The utility patent consists of five independent claims, numbered 1, 50, 53, 54, and 55, and fifty dependent claims.  '827 Patent.  Mardkha, pointing to claims 53 and 54 as "illustrative of the breadth of the patent," seeks to construct the independent claims of the patent as claiming "the general arrangement of brilliant facets in the crown and step facets in the pavilion."  (Defs.' Mem. of L. 8–9.)  To support this broad construction, Mardkha refers the Court to a paragraph in the application (and now in the issued utility patent) stating that the patent only describes a "limited number of embodiments of the invention" and that more "will now be obvious to those skilled in the art . . . which do not depart from the spirit of the invention."  (Defs.' Ex. H ¶ 51.)  However, the clear language of the independent claims of the utility patent is not as broad as Mardkha contends.  Both claims 53 and 54 require that the first step beneath the girdle have "exclusively triangular shaped facets."  '827 Patent.  Both claims 1 and 50 require that the "girdle break be[] cut with

14

triangular and quadrilateral shaped facets." *Id.*  In other words, the facets in the first tier

beneath the girdle are not composed of standard rectangular step facets, but rather triangles

and quadrilaterals.  The language in the introduction to the patent application further makes

clear that the "steeply cut triangular lower girdle facets function to successfully combine

the step cut pavilion and brilliant crown into a cohesive stone."  (Defs. Ex. H ¶ 26.)  Thus,

the Court constructs independent claims 1, 50, 53, and 54 of the utility patent as all

requiring a modified step pavilion with a brilliant tier.[1]

> This construction is further supported by the prosecution history of the utility

patent.  Claim 45 in the patent *application* (redesignated claim 53 in the issued patent)

reads as follows: "A mixed cut gemstone comprising a brilliant cut crown; and a step cut

pavilion, said step cut pavilion having at least two steps."  (Defs.' Ex. H.)  This is exactly

the construction Mardkha now seeks to have the court apply to both the utility and design

patents.  However, when the examiner issued the notice of allowance, claim 45 had been

amended to also require that the "first step being closest to the crown" have "exclusively

triangular shaped facets."  (Defs.' Ex. I.)  Moreover, the examiner noted that "[n]ewly

allowed claims are allowable as the prior art fails to teach or make obvious the gemstone as

claimed comprising a step cut pavilion with at least two steps, with the first such step

having exclusively triangular shaped facets."  (*Id.* ¶ 3.)

> The Court need not construct each dependent claim.  These claims consist of

specific facet shapes and ranges for facet angles and alignment, representing the preferred

embodiment of the diamond, measured from the prototype, and other potential

---

[1] Claim 55, the final independent claim, does not require "exclusively triangular shaped facets," but does require the first step to include "at least one triangular shaped facet."  '257 Patent.

manifestations.  (Mardkha Tr. 150, 188.)  Their meaning is apparent and requires no construction.

## B.    Application

The Court next turns to the respective roles of Mardkha and plaintiff in conceiving of the claims of the patents.  It is clear that Mardkha conceived of the diamond generally, in that he thought to cut a diamond like a gemstone to control its brilliance and show off its depth and clarity.  His conversation with a representative from Tiffany stands undisputed and occurred before plaintiff claims to have been involved in any inventive process.  Mardkha argues that this resolves the case because it is the only meaningful limitation in the invention and only conception of the "spirit" of the invention would render plaintiff a co-inventor.  The Court disagrees.  As explained above, plaintiff need only show by clear and convincing evidence that he made a contribution to the conception of a single claim, so long as that contribution is not insignificant when measured against the dimension of the full invention.  Therefore, the Court must examine plaintiff's alleged contributions to determine whether they were sufficient to make him a co-inventor.

Plaintiff claims that he conceived of many, if not all, of the particular facet shapes, alignments, and angles of the diamond.  (Pl. Decl. ¶ 4.)  Plaintiff argues that contribution to the conception of specific facet angles and shapes, as memorialized in the dependent claims[2] of the utility patent, is sufficient to support a claim of co-inventorship.  He offers

---

[2] Mardkha suggests that plaintiff's co-inventorship claim must fail because he only alleges contributions to dependent claims.  (*See* Defs.' Reply 1.)  While at least one court has found that a claim of co-inventorship should be viewed "with an eye toward the independent claims," *Yeda Research & Dev. Co. v. ImClone Sys.*, 443 F. Supp. 2d 570, 618 (S.D.N.Y. 2006), the Federal Circuit has assumed that a claim of co-inventorship could properly be based on a contribution to a dependent claim.  *See, e.g., Eli Lilly & Co.*, 376 F.3d at 1357, 1364 (assuming that an individual could be named a co-inventor based on a contribution only to dependent claims, but finding that there was insufficient evidence to support a verdict so holding).  However, where, as here, the dependent claim only describes a preferred embodiment of the invention and is not an actual limitation, the Federal Circuit has suggested that contribution to its conception is inadequate to make a

as corroborating evidence, among other things, his superior knowledge of diamonds, contemporaneous notes, drawings, and logs, testimony from the principal cutter and factory owner, and his contributions to the patent application.  The Court finds that even if his testimony and this corroborating evidence would allow a reasonable juror to conclude that he has proven his contribution to the conception of the diamond specifics by clear and convincing evidence, this claim must still fail.  A contributor cannot be named a co-inventor if he only exercises ordinary skill in the art to reduce an idea to practice, because at that stage conception is already complete.  *See Ethicon, Inc.*, 135 F.3d at 1460; *Burroughs Wellcome Co.*, 40 F.3d at 1228.  This question is factual, and a genuine issue of material fact will preclude the entry of summary judgment.  *See Moor v. Honeywell Int'l Inc.*, No. 02-3142, 2006 U.S. Dist. LEXIS 14025, at *6, *11 (D.N.J. Mar. 13, 2006) (citing *Caterpillar Inc. v. Sturman Indus.*, 387 F.3d 1358, 1377–78 (Fed. Cir. 2004)).

However, the Court finds no genuine issue of material fact as to this question. Multiple witnesses, including plaintiff and his expert, testified that it only requires ordinary skill in the art to choose facet angles and alignments once the arrangement of facets (brilliant crown, step-cut pavilion with first step being composed of brilliant facets) is dictated; that is, any skilled diamond cutter could have cut the stone at the direction of another, although the results would vary.  (*See* Pl. Tr. 99:2–5; Haske Tr. 124:2–15; Meir Tr. 20:7–18; Hanson Tr. 93:8–23.)  No witness or expert suggested otherwise.  This is not to belittle the effort that would be required to take a general configuration of facets and

---

contributor a co-inventor.  *See Sewell*, 21 F.3d at 416 (dismissing claim of co-inventorship based on method found in prior art *and* it was "not a necessary limitation" of the invention).  Indeed, as plaintiff himself points out, there are actually mistakes in some of the dependent claims of the patent.  (*See* Defs. Ex. J.)  It would be nonsensical to allow a contributor to be named a co-inventor, and thus co-owner of the entire patent, based on a contribution to a single, non-limiting, and perhaps even erroneous dependent claim.

create a visually striking diamond, but such a contribution does not make one a co-inventor.  Once the basic configuration of facets is set, the ideal stone, in the words of plaintiff's principal cutter, "[d]epends what you want the stone to look like."  (Meir Tr. 69–70.)  After conception, the inventor (whether Mardkha or plaintiff) could rely on a diamond cutter to produce different prototypes following that design and to choose one.  *See Ethicon, Inc.*, 135 F.3d at 1460 ("merely assisting the actual inventor after conception of the claimed invention" does not make one a co-inventor); *Shatterproof Glass Corp.*, 758 F.2d at 624 (inventor "may use the services . . . of others in the process of perfecting his invention without losing his right to a patent").  Thus, the Court holds that plaintiff's contribution to the specific angles, shapes, and alignments found in the dependent claims is insufficient to render him a co-inventor.

Plaintiff also claims that he contributed to the conception of the brilliant tier.  Based on the Court's construction of the patents, such a contribution would support a claim of co-inventorship.  The brilliant tier is an essential element of both the design patent and independent claims of the utility patent, as discussed above.  To survive summary judgment, plaintiff must present evidence on which a reasonable factfinder could conclude that he has proven conception of the brilliant tier by clear and convincing evidence.  This evidence must extend beyond plaintiff's own testimony.  At Mardkha's deposition, Mardkha explicitly stated that he had come up with the idea of triangular facets.  (Mardkha Tr. 163:7–164:4.)  At plaintiff's deposition, on the other hand, plaintiff was unable to articulate what his contribution was to the design of the diamond, other than to claim (in spite of persuasive evidence to the contrary) that the combination of a brilliant crown with a step pavilion was his idea alone, an idea that he now argues was not even patentable.  (Pl.

Tr. 92–93.)  Significantly, plaintiff fails to mention the brilliant tier.  However, plaintiff's

declaration, drafted to accompany his opposition to Mardkha's motion, states that he

"came up with the idea" of triangular facets.  (Pl.'s Decl. ¶¶ 7, 8.)  While his deposition

testimony does not expressly contradict his self-serving declaration, it is difficult to

understand why plaintiff would not have testified that he conceived of the brilliant tier

during his deposition in response to direct questions as to the contributions he made to the

design.  It is questionable whether this self-serving declaration, by itself, creates a genuine

issue of fact.  *See Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d Cir. 1997) ("a party cannot

create a genuine issue of fact by submitting an affidavit that contradicts previous

deposition testimony").

Even if the Court accepted plaintiff's statement in his declaration, the evidence

presented must be clear and convincing, and include at least some evidence beyond

plaintiff's testimony.  Plaintiff points to his contemporaneous notes and drawings to prove

that the original version of the diamond, as suggested by Mardkha, did not contain this

feature and that later versions did after he had worked on the stone.  (*See* Pl.'s Exs. S, T.)

But this evidence provides no corroboration upon closer inspection.  The papers show only

that the idea for using triangular facets in the first tier of the pavilion was not part of the

original design, but originated after the development process was already underway, a

point not disputed by Mardkha.  (*See* Mardkha Tr. 163–164.)  The documents in no way

state or suggest, one way or another, who came up with the idea of using facets to bring

together the disparate elements of the diamond.  Plaintiff points the Court to no third-party

testimony stating that plaintiff conceived of the idea of triangular facets.  At most, the

principal cutter states that while he was taking instructions from plaintiff, he was unable to

say whether specific instructions originated from Mardkha.  (Meir Tr. 41, 44.)  Plaintiff's

other purported corroborating evidence, such as his greater familiarity with diamonds, the

difficulty of dictating specific facet angles and shapes from abroad, his furnishing of

specifics for the patent application, does not even amount to circumstantial evidence of his

conception of the brilliant tier.  Nothing in the record suggests that someone familiar with

jewelry and gemstones, but not physically sitting at the cutting wheel, would be unable to

conceive of a brilliant tier.

     Without corroborating evidence, a trial would devolve into Mardkha and plaintiff

both contending that the triangular facets were their idea.  In such a case, plaintiff must

lose as a matter of law.  *See Linear Tech. Corp v. Impala Linear Corp*, No. C-98-1727,

2001 U.S. Dist. LEXIS 25905, at *91 (N.D. Cal. Sept. 21, 2001) (granting summary

judgment based on the lack of any corroborating evidence), *aff'd as to this holding,*

*vacated on other grounds*, 379 F.3d 1311 (Fed. Cir. 2004); *Stern v. Trs. of Columbia Univ*.,

No. 01 Civ. 10086 (RCC), 2005 U.S. Dist. LEXIS 2418, at *19 (S.D.N.Y. February 18,

2005) (granting summary judgment based on "lack of any clear and convincing

corroborating evidence").  Because "no reasonable juror could find that [plaintiff's]

inventorship claim was corroborated," the Court grants Mardkha's motion for summary

judgment dismissing plaintiff's co-inventor and co-owner claims.  *Linear Tech. Corp.*, 379

F.3d at 1329.[3]

## II.    Constructive Trust

     Mardkha also moves for summary judgment dismissing plaintiff's claim that he is

entitled to a constructive trust.  Under New York law, a party claiming entitlement to a

---

[3] Because plaintiff's claim for co-inventorship fails, the Court does not reach Mardkha's alternative defenses
of laches and estoppel.

constructive trust must ordinarily establish: "(1) a confidential or fiduciary relation, (2) a promise, (3) a transfer in reliance thereon and (4) unjust enrichment." *Sharp v. Kosmalski*, 351 N.E.2d 721, 723 (N.Y. 1976). When this case was before the Court on defendants' motion to dismiss, Mardkha argued that plaintiff failed to plead the second element, the existence of a promise by Mardkha to plaintiff. While the Court agreed that no express promise was alleged, it nonetheless rejecting Mardkha's argument, finding that plaintiff had alleged the existence of a partnership and that "[i]nherent in every fiduciary relationship is [an implied] promise to act in the best interests of the venture or partnership to which the fiduciary belongs." Mardkha now argues that discovery has demonstrated as a matter of law that no partnership or fiduciary relationship existed from which to imply a promise and thus the second element of a constructive trust is not satisfied. The Court agrees.

Plaintiff offers no evidence, and the Court can find none, supporting the existence of a formal partnership. Indeed, plaintiff testified to the absence of any concrete terms of the alleged partnership. (Pl. Tr. 129–35.) In the absence of even the most basic terms of the partnership, and the absence of any agreement, the Court finds that no partnership existed.[4] Nor does plaintiff offer any evidence of a fiduciary relationship from which to imply a promise. A New York court described a fiduciary relationship as one "which results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act. It is a relationship

---

[4] Under New York law, "[t]he receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business," as long as the profits were not received by an employee as wage payments. N.Y. P'ship Law § 11(4); *see also Olson v. Smithtown Medical Specialists, P.C.*, 602 N.Y.S.2d 649, 650 (N.Y. App. Div. 1993). Plaintiff has presented no evidence that he received any profits of Mardkha's business or mixed-cut diamond venture. Indeed, he affirmatively argues that he did not. (Pl.'s Opp'n 32.) Therefore, the Court does not imply the existence of a partnership between plaintiff and Mardkha.

whereby one retains a degree of direction and control over another."  *Meese v. Miller*, 436

N.Y.S.2d 496, 499 (N.Y. App. Div. 1981) (citations and internal quotation marks omitted).

There is no evidence that Mardkha agreed to act on plaintiff's behalf and subject to his

control when he allegedly provided Mardkha with design information.  Therefore, the

Court finds that no fiduciary relationship existed either.  Without either a partnership or a

fiduciary relationship, the Court holds that there was no implied promise from Mardkha on

which plaintiff relied in allegedly transferring design information and thus plaintiff fails to

satisfy a required element of a constructive trust.

In opposing Mardkha's motion, plaintiff argues only that under the first element of

a constructive trust, he need only show a confidential or fiduciary relationship, not a

partnership.  He offers evidence that he and Mardkha were in a confidential relationship.

At most, plaintiff raises a genuine issue as to the existence of a confidential relationship,

which goes to the first required element.  However, this is unavailing as he has failed to

raise a genuine issue as to the second required element.  Therefore, the Court grants

summary judgment dismissing plaintiff's claim for a constructive trust.

## III.    Unjust Enrichment

Finally, Mardkha seeks summary judgment dismissing plaintiff's claim of unjust

enrichment.  Under New York law, the basic elements of an unjust enrichment claim are:

"1) defendant was enriched; 2) such enrichment was at the expense of the plaintiff; and 3)

the circumstances were such that in equity and good conscience the defendant should make

restitution."  *Chase Manhattan Bank v. Banque Intra, S.A.*, 274 F. Supp 496, 499

(S.D.N.Y. 1967) (citing *Miller v. Schloss*, 113 N.E. 337 (N.Y. 1916)).  Mardkha testified

that Tiffany paid him $500,000 initial payment and the larger of $250,000 annually or

1.5% of royalties on sales of the patented diamond.  (Mardkha Tr. 277–78.)  Thus,

Mardkha and his company have received, at a minimum, $1.5 million to date from the

licensing of the diamond.  From the evidence before the Court, it appears that plaintiff

received $5,000 for his assistance in developing the diamond, or at most several thousand

dollars more if he marked up the labor, material, and shipping costs listed on the invoice.[5]

While plaintiff's contribution to the diamond patent is insufficient (or insufficiently

corroborated) to make him a co-inventor and co-owner, he has certainly raised a genuine

issue of material fact as to whether Mardkha was unjustly enriched at his expense.

Mardkha is unable to show that as a matter of law, plaintiff fails to satisfy any of the three

elements of unjust enrichment.  Therefore, the Court denies summary judgment dismissing

the unjust enrichment claim.

Because the Court has dismissed the federal claims providing it with original

jurisdiction, it must decide whether to exercise supplemental jurisdiction over the

remaining state law unjust enrichment claim.  Under 28 U.S.C. § 1367(c), a district court

may, but need not, decline to exercise supplemental jurisdiction over a state law claim

when the court has dismissed all claims over which it has original jurisdiction.  This

decision is within the limited discretion of the court, who should base its decisions on

"judicial economy, convenience, fairness, and comity."  *See Valencia v. Sung M. Lee*, 316

F.3d 299, 305 (2d Cir. 2003) (citing *Carnegie-Mellon University v. Cohill*, 484 U.S. 343,

350 n.7 (1988).  Because the parties have already completed discovery, and because the

state law claim will not require resolution of any difficult questions of state law, the Court

---

[5] Mardkha argues that this claim must be dismissed as a matter of law because he has paid plaintiff a total of over $200,000 from 1999 through 2002, which is above his usual annual salary and "clearly compensate[s plaintiff] for whatever services he provided."  (Defs.' Mem. of L. 30.)  While Mardkha may group all of plaintiff's work together, payments received specifically for plaintiff's work on the diamond design and patenting are the only payments that are relevant for this claim.

chooses in its discretion to exercise supplemental jurisdiction over the state law unjust enrichment claim.

## **CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment **[37]** dismissing plaintiff's claims of co-inventorship and co-ownership, and for a constructive trust are GRANTED. Defendants' motion for summary judgment dismissing plaintiff's claim of unjust enrichment is DENIED.

SO ORDERED.

Dated: New York, New York
July 10, 2007

Richard J. Holwell
United States District Judge

24





Diagram A





Diagram B